**POULIN | WILLEY | ANASTOPOULO, LLC**
Eric M. Poulin (California State Bar No. 298476)
    *eric.poulin@poulinwilley.com*
Paul J. Doolittle (*Pro Hac Vice* Forthcoming)
    *paul.doolittle@poulinwilley.com*
Seth Little (*Pro Hac Vice* Forthcoming)
    *seth.little@poulinwilley.com*
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536

**BOHREN LAW**
John C. Bohren (California State Bar No. 295292)
8560 West Sunset Boulevard, 4th Floor
West Hollywood, CA 90069
Telephone: (619) 433-2803
Fax: (800) 867-6779
Attorneys for Plaintiffs
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **KIMBERLY BLAKE, and LAMIBIA DUNHAM, individually and on behalf of all others similarly situated**, <br><br>        **Plaintiffs,** <br>   **vs.** <br><br> **TICKETMASTER, LLC, and LIVE NATION, ENTERTAINMENT, INC.** <br><br>       **Defendants.** | Case No.: **2:24-cv-04973**___ <br><br> **CLASS ACTION COMPLAINT FOR:** <br><br> **(1) Negligence** <br> **(2) Negligence *Per Se*** <br> **(3) Breach of Implied Contract** <br> **(4) Unjust Enrichment** <br> **(5) California's Unfair Competition Law ("UCL") § 17200 – Unlawful Business Practice** <br> **(6) Invasion of Privacy** <br> **(7) Declaratory Judgment** <br><br> **DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT    1

## CLASS ACTION COMPLAINT

Plaintiffs Kimberly Blake, and Lamibia Dunham, ("Plaintiffs") bring this Class Action Complaint ("Complaint") against Ticketmaster, LLC and Live Nation Entertainment, Incorporated (collectively, "Defendants") as individuals and on behalf of all others similarly situated, and allege, upon personal knowledge as to Plaintiffs' own actions and to counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.    Plaintiffs bring this class action against Defendants for their failure to properly secure and safeguard the personally identifiable information ("PII")[1] of its customers, including, but not limited to: full names, addresses, email addresses, phone numbers and credit card details.

2.    Ticketmaster, LLC ("Ticketmaster") is one of the largest ticket sales and distribution companies in the world. Ticketmaster operates a digital ticketing platform that requires customers to provide their PII prior to purchase. Upon information and belief, in February 2009, Ticketmaster entered into an agreement to merge with event promoter Live Nation to form Live Nation Entertainment,

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

CLASS ACTION COMPLAINT          2

Incorporated ("Live Nation"). Together, Defendants promote, operate, and manage entertainment venues and ticket sales for live entertainment events.

3.      On, or about, May 20, 2024, Plaintiffs' and Class Members' personal information—which they entrusted to Defendants on the mutual understanding that Defendants would protect it against unauthorized disclosure—was compromised in a data breach (hereafter referred to as the "Data Breach").[2]

4.      The Data Breach included personal details of about 560 million Ticketmaster customers.[3]  The PII compromised in the Data Breach was exfiltrated by cyber-criminals who target PII for its value to identity thieves.

5.      ShinyHunters, the group claiming responsibility for the Data Breach, has been linked to a string of high-profile data breaches resulting in millions of dollars in losses.[4] The hackers are demanding a ransom payment of $500,000.00 to prevent the data from being resold on the dark web; a clear indication that the data breach was for the purpose of using the Plaintiffs' and Class Members' personal information to perpetuate identity theft and other fraud.[5]

---

[2]      *Live         Nation         Entertainment         Form         8-K*, https://www.sec.gov/Archives/edgar/data/1335258/000133525824000081/lyv-20240520.htm (last accessed June 13, 2024).
[3]      *Data       allegedly       stolen       from       560       million       Ticketmaster       users*, https://www.bbc.com/news/articles/c899pz84d8zo (accessed June 11, 2024).
[4] *Id.*
[5] *Id.*

CLASS ACTION COMPLAINT          3

1



2

3

4

5

6

7

8

9

10

11

12

*Screenshot of ShinyHunters advertising the sale of Ticketmaster customer PII on the dark web.*

13

14          6.      The invasion of the Plaintiffs' and Class Members' privacy suffered in

15   this Data Breach constitutes an injury in fact. Additionally, the Plaintiffs and Class

16   Members are at an increased risk of future harm, including identity theft, fraud,

17

18   spam, phishing, or other impersonation attacks.

19          7.      There is a substantial risk of future identity theft or fraud where the

20   Plaintiffs' and Class Members' PII was targeted by a sophisticated hacker group

21

22   (ShinyHunters), known for stealing and reselling as much personal and financial data

23   as they can.[6] Furthermore, since 2020, ShinyHunters has stolen over 900 million

24   customer records in a series of high-profile data breaches (e.g., GitHub, AT&T,

25

26   _____

27   [6] *What we know about the 'remarkably devious' ShinyHunters hackers allegedly behind the Ticketmaster data leak,* https://www.abc.net.au/news/2024-05-31/shinyhunters-cyber-hackers-ticketmaster-data-breach/103911928 (last accessed June 13, 2024).

28

CLASS ACTION COMPLAINT          4

Pizza Hut). Upon information and belief, ShinyHunters has accumulated enough personal information from that series of data breaches to be able to open a bank account or commit other fraud using stolen identities.

8.    Plaintiffs and Class Members face a substantial risk of future spam, phishing, or other social engineering attacks where their full names, addresses, email addresses, and phone numbers were stolen by a hacker group (ShinyHunters), known for stealing and reselling personal data. For example, once a cybercriminal has sold a stolen email address or phone number, that email address or phone number is sent spam messages that are "carefully calculated to get the recipient to click on a link that infects a computer with malware."[7] Once the computer is infected with malware, the computer is locked down and the user is sent a ransom demand, which must be paid to regain access to the computer.

9.    As a result of the Data Breach, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages;

---

[7] *Id.*

CLASS ACTION COMPLAINT          5

and (x) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendants' possession or control and is subject to further unauthorized disclosures so long as Defendants fail to implement appropriate and reasonable measures to protect the PII.

10.    The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable data protection procedures, including vendor management, necessary to protect consumers' PII from a foreseeable and preventable risk of unauthorized disclosure.

11.    Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' PII was a known risk to Defendants, and thus, Defendants were on notice that failing to take steps necessary to secure the PII from those risks left the data in a dangerous condition.

12.    Defendants disregarded the rights of Plaintiffs and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems, or the data systems of its vendors, were protected against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

Plaintiffs and Class Members are now at risk because of Defendants' wrongful conduct.

13.     Armed with the PII acquired in the Data Breach, data thieves have already engaged in identity theft and fraud and can, in the future, commit a variety of crimes including, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

14.     As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a substantial risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft. Plaintiffs and Class Members may also incur out of pocket costs, for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft. Plaintiffs and Class Members may also incur out of pocket costs, for purchasing products to protect themselves from spam emails, phone calls, and text messages.

15.     Plaintiffs bring this class action lawsuit on behalf all those similarly situated to address Defendants' inadequate safeguarding of Class Members' PII that it collected and maintained, and for failing to provide timely and adequate notice to

Plaintiffs and other Class Members that their information had been disclosed to an unauthorized third party and precisely what information was accessed.

16.    Through this Complaint, Plaintiffs seek to remedy these harms individually, and on behalf of all similarly situated individuals whose PII was accessed during the Data Breach. Plaintiffs and Class Members have a continuing interest in ensuring that their personal information is kept confidential and protected from disclosure, and they should be entitled to injunctive and other equitable relief.

## JURISDICTION & VENUE

17.    This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, including Plaintiffs, is a citizen of a state different from Defendants.

18.    This Court has personal jurisdiction over Defendants because their principal place of business is in this District and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District. Defendants have also purposefully availed themselves of the laws, rights, and benefits of the State of California.

CLASS ACTION COMPLAINT            8

19.    Venue is proper under 18 U.S.C § 1391(b)(1) because Defendants maintain their principal place of business in this District and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

## PARTIES

20.    Plaintiff Lamibia Dunham is a citizen of the State of South Carolina. At all relevant times, Plaintiff Dunham has been a resident of Florence, South Carolina.

21.    Plaintiff Kimberly Blake is a citizen of the State of South Carolina. At all relevant times, Plaintiff Blake has been a resident of Columbia, South Carolina.

22.    Defendant Live Nation Entertainment Incorporated, maintains a principal place of business at 9348 Civic Center Drive, Beverly Hills, California 90210-3624. Live Nation produces live concerts and offers digital ticketing services for leading arenas, stadiums, professional sports franchises and leagues, college sports teams, performing arts venues, museums, and theaters around the world. Live Nation provides ticketing solutions through websites, mobile apps, retail outlets and call centers.

23.    Defendant Ticketmaster, LLC, is a wholly owned subsidiary of Defendant Live Nation Entertainment, Incorporated, with a principal place of business located at 9348 Civic Center Drive, Beverly Hills, California 90210-3624. Ticketmaster operates as a ticket distribution company; it buys, transfers, and sells

CLASS ACTION COMPLAINT          9

tickets for live music, sporting, arts, theater, and family events around the around
the world.

## FACTUAL ALLEGATIONS

24.    Defendants promote, operate, and manage entertainment venues and
ticket sales for live entertainment events. Defendants permit users to buy and sell
tickets online for concerts, sports, theater, family, and other events using the website
www.ticketmaster.com.

25.    Plaintiffs and Class Members are current and former customers of
Ticketmaster and have used, or created accounts on, ticketmaster.com.

26.    In the course of their relationship, customers, including Plaintiffs and
Class Members, provided Defendants with at least the following: full names, dates
of birth, contact information, and credit card, debit card, or banking information.

27.    Upon information and belief, while collecting PII from customers,
including Plaintiffs, Defendants promised to provide security measures to protect
customer information.   When customer data is transferred to a third-party,
Defendants promised to "ensure that appropriate safeguards are put in place" to
ensure customer data is "protected to the highest standard."[8]   More specifically,
when personal information is transferred to a third party, Defendants represented

---

[8] *Ticketmaster Privacy Policy*, https://privacy.ticketmaster.com/privacy-policy (last accessed June
13, 2024).

CLASS ACTION COMPLAINT          10

that they would "use contractual measures and internal mechanisms requiring the recipient to comply with the privacy standards of the exporter."[9] These promises were contained in the applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

28.     Plaintiffs and the Class Members, as customers of Defendants, relied on these representations and on these sophisticated business entities to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

29.     On May 20, 2024, Live Nation identified unauthorized activity within a third-party cloud database environment containing personal data (primarily from its Ticketmaster L.L.C. subsidiary).[10] On May 27, 2024, Live Nation discovered that the personal details of about 560 million Ticketmaster customers—including Plaintiffs and Class Members—was exfiltrated by cyber-criminals demanding a ransom payment of $500,000.00 to prevent the data from being resold on the dark web.

30.     Information    disclosed    by    ShinyHunters,    the    cyber-criminals responsible for the Data Breach, indicates the stolen information includes "a treasure trove of sensitive user information, including full names, addresses, email addresses,

---

[9] *Id.*
[10]     *Live     Nation     Entertainment     SEC     Form     8-K,* https://www.sec.gov/Archives/edgar/data/1335258/000133525824000081/lyv-20240520.htm (last accessed June 13, 2024).

CLASS ACTION COMPLAINT          11

phone numbers, ticket sales and event details, order information, and partial payment card data."[11]

31.    With the information that was accessed in the Data Breach, "cybercriminals can commit identity theft and financial fraud, launch phishing attacks, or take over online accounts. They may also use the data for blackmail, extortion, medical identity theft or credential stuffing which could lead to significant financial losses for customers, [and] damage to credit scores."[12]

32.    Data stolen in the Data Breach included unencrypted customer data that had been shared or stored with a third-party cloud database vendor. Plaintiffs further believe that their PII and that of the Class Members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of the ShinyHunters group and other cybercriminals that commit cyber-attacks of this type.

33.    Defendants collect, and sell the PII of its customers, former customers, and other personnel. Defendants collect personal information when a customer buys merchandise or a ticket to an event. Defendants then sell personal information like names, physical addresses, phone numbers, email addresses, IP addresses,

---

[11] *Hackers Claim Ticketmaster Data Breach: 560M Users' Info for Sale at $500K,* https://hackread.com/hackers-ticketmaster-data-breach-560m-users-sale (last accessed June 13, 2024).

[12] *Id.*

information about transactions, preferences, and attributes, cookies and device attributes to business partners, data brokers, and service providers.[13]

34.    By obtaining, collecting, and using Plaintiffs' and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' PII from unauthorized disclosure.

35.    Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII and would not have entrusted it to Defendants absent a promise to safeguard that information. Indeed, Defendants make the following representations to customers on their ticketmaster.com website:

a. "The security of our fans' information is a priority for us."

b. "We take all necessary security measures to protect personal information that's shared and stored with us."

c. "We work with our partners to put on amazing live events and provide additional services that we think you'll love. We always ask them to maintain the same standards of privacy."

d. "We embed privacy in the development of our products and services to ensure that we always respect your personal information."

e. "As an international company, no matter where you are located, our control framework is built around global data protection laws."

f. "We comply with all applicable data protection laws and listen to your expectations when it comes to how your information is handled."

---

[13] *Ticketmaster Privacy Policy*, https://privacy.ticketmaster.com/privacy-policy (last accessed June 13, 2024).

CLASS ACTION COMPLAINT            13

g. "We have a global privacy team of trust and security professionals that ensure end-to-end protection of your personal information throughout the data lifecycle."[14]

36.     Plaintiffs and the Class Members relied on Defendants to keep their PII confidential and securely maintained, to ensure that third-party vendors adhered to reasonable security measures, to use this information for business purposes only, and to permit only authorized uses and disclosures of this information.

37.     Defendants' representations about their commitment to security and confidentiality of the personal information they collect and share with third parties was false or misleading as an unauthorized person was able to access and exfiltrate personal data from one of Defendants' cloud database vendors. Defendants have failed to maintain the confidentiality and security of Plaintiffs' and the Class Members' PII and/or failed to take reasonable steps to protect Plaintiffs' and the Class Members' PII from disclosure.

### *Data Breaches Are Avoidable*

38.     Upon information and belief, the Data Breach was a direct result of Defendants' failure to implement adequate and reasonable data protection procedures, including vendor management, necessary to protect Plaintiffs' and Class Members' PII from a foreseeable and preventable risk of unauthorized disclosure.

---

[14] *Ticketmaster Commitments*, https://privacy.ticketmaster.com/our-commitments (last accessed June 13, 2024).

CLASS ACTION COMPLAINT            14

39.    Upon information and belief, the Data Breach occurred as the result of a ransomware attack. In a ransomware attack the attackers use software to encrypt data on a compromised network, rendering it unusable and then demand payment to restore control over the network.[15] Ransomware groups frequently implement a double extortion tactic, where the cybercriminal posts portions of the data to increase their leverage and force the victim to pay the ransom, and then sells the stolen data in cybercriminal forums and dark web marketplaces for additional revenue."[16]

40.    To prevent and detect cyber-attacks and/or ransomware attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

Preventative Measures

a. Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

b. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email.

c. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

d. Configure firewalls to block access to known malicious IP addresses.

e. Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

---

[15] *Ransomware FAQs*, https://www.cisa.gov/stopransomware/ransomware-faqs (last accessed June 13, 2024).
[16] *Ransomware: The Data Exfiltration and Double Extortion Trends*, https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends (last accessed June 13, 2024).

CLASS ACTION COMPLAINT          15

f.  Set anti-virus and anti-malware programs to conduct regular scans automatically.

g.  Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

h.  Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

i.  Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

j.  Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

k.  Consider disabling Remote Desktop protocol (RDP) if it is not being used.

l.  Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

m.  Execute operating system environments or specific programs in a virtualized environment.

n.  Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

o.  Conduct an annual penetration test and vulnerability assessment.

p.  Secure your backups.[17]

q.  Identify the computers or servers where sensitive personal information is stored.

r.  Identify all connections to the computers where you store sensitive information. These may include the internet, electronic cash registers,

---

[17] *How to Protect Your Networks from Ransomware*, at p.3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed June 13, 2024).

CLASS ACTION COMPLAINT            16

computers at your branch offices, computers used by service providers to support your network, digital copiers, and wireless devices like smartphones, tablets, or inventory scanners.

s.  Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks. Depending on your circumstances, appropriate assessments may range from having a knowledgeable employee run off-the-shelf security software to having an independent professional conduct a full-scale security audit.

t.  Don't store sensitive consumer data on any computer with an internet connection unless it's essential for conducting your business.

u.  Encrypt sensitive information that you send to third parties over public networks (like the internet) and encrypt sensitive information that is stored on your computer network, laptops, or portable storage devices used by your employees. Consider also encrypting email transmissions within your business.

v.  Regularly run up-to-date anti-malware programs on individual computers and on servers on your network.

w.  Check expert websites (such as www.us-cert.gov) and your software vendors' websites regularly for alerts about new vulnerabilities and implement policies for installing vendor-approved patches to correct problems.

x.  Restrict employees' ability to download unauthorized software. Software downloaded to devices that connect to your network (computers, smartphones, and tablets) could be used to distribute malware.

y.  Scan computers on your network to identify and profile the operating system and open network services. If you find services that you don't need, disable them to prevent hacks or other potential security problems.

z.  To detect network breaches when they occur, consider using an intrusion detection system.

aa. Create a "culture of security" by implementing a regular schedule of employee training. Update employees as you find out about new risks and vulnerabilities.

bb. Tell employees about your company policies regarding keeping information secure and confidential. Post reminders in areas where

CLASS ACTION COMPLAINT          17

sensitive information is used or stored, as well as where employees congregate.

cc. Teach employees about the dangers of spear phishing—emails containing information that makes the emails look legitimate. These emails may appear to come from someone within your company, generally someone in a position of authority. Make it office policy to independently verify any emails requesting sensitive information.

dd. Before you outsource any of your business functions investigate the company's data security practices and compare their standards to yours.[18]

41.    Defendants' security practices were ineffective since Defendants did not ensure their third-party vendors were responsible for implementing them. When a vendor is using, collecting, or storing personal data, the following are common data protection requirements:

Vendor Management

a. Require the vendor to impose technical and organizational measures to protect personal data, similar to those listed above.

b. Ensure that the vendor requires each individual processing the personal data to be subject to a duty of confidentiality.

c. Require the vendor (and any subcontractors) to comply with all applicable statutes and data protection obligations as the Defendants.

d. Require the vendor to cooperate with reasonable privacy assessments and security audits.

e. Prohibit the vendor from retaining, using, or disclosing personal data for any purpose other than the specified business purpose.

f. Require the vendor to notify the Defendants of a data breach or after vendor makes a determination that it can no longer meet its data protection obligations.

---

[18] *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed June 13, 2024).

CLASS ACTION COMPLAINT          18

g. Require the vendor to provide timely notice to individuals impacted by a data breach event.

42.   Given that Defendants stored the PII of its current and former customers, Defendants could and should have implemented all the above measures to prevent and detect cyberattacks. The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of Plaintiffs' and the Class members' PII.

43.   Defendants knew and understood unencrypted PII is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding customer PII and of the foreseeable consequences that would occur if Defendants' network (or the network of their vendors) was breached, including the significant cost that would be imposed on Plaintiffs and the Class Members as a result.

44.   Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records. The Class is incurring and will continue to incur such damages in addition to any harms associated with the fraudulent use of their PII.

45.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures.

46.    Personal identifying information is of great value to criminals. Data such as name, address, phone number, and credit history has been sold at prices ranging from $40 to $200 per record.[19]

47.    Given these facts, by transacting business with Plaintiffs and Class Members, collecting and selling their PII, using their PII to market additional products and services to them, and then compromising the privacy of their PII has deprived Plaintiffs and Class Members of the benefit of their bargain with Defendants.

48.    The invasion of the Plaintiffs' and Class Members' privacy suffered in this Data Breach constitutes an injury in fact. Additionally, the Plaintiffs and Class Members are at an increased risk of future harm, including identity theft, fraud, spam, phishing, or other impersonation attacks.

49.    There is a substantial risk of future identity theft or fraud where the Plaintiffs' and Class Members' PII was targeted by a sophisticated hacker group (ShinyHunters), known for stealing and reselling as much personal and financial data

---

[19] *In the Dark*, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymousbrowsing/in-the-dark/

as they can.[20] Furthermore, since 2020, ShinyHunters has stolen over 900 million customer records in a series of high-profile data breaches (*e.g.*, GitHub, AT&T, Pizza Hut). Upon information and belief, ShinyHunters has accumulated enough personal information from that series of data breaches to be able to open a bank account or commit other fraud using stolen identities.

50.    Plaintiffs and Class Members face a substantial risk of future spam, phishing, or other social engineering attacks where their full names, addresses, email addresses, and phone numbers were stolen by a hacker group known for selling personal data on the dark web.

51.    As a result of the Data Breach, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experience an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b)

---

[20] *What we know about the 'remarkably devious' ShinyHunters hackers allegedly behind the Ticketmaster data leak*, https://www.abc.net.au/news/2024-05-31/shinyhunters-cyber-hackers-ticketmaster-data-breach/103911928 (last accessed June 13, 2024).

remains backed up under Defendants' possession or control and is subject to further

unauthorized disclosures so long as Defendants fail to implement appropriate and

reasonable measures to protect the PII.

52.    As a result of the Data Breach, unauthorized individuals can easily

access the PII of Plaintiffs and Class Members. The link between a data breach and

the risk of identity theft is simple and well established. Criminals acquire and steal

PII to monetize the information. Criminals monetize the data by selling the stolen

information on the black market to other criminals who then utilize the information

to commit a variety of identity theft related crimes.

53.    Plaintiffs' and Class Members' PII is of great value to hackers and

cyber criminals, and the data stolen in the Data Breach has been used and will

continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and

Class Members and to profit off their misfortune.

54.    One such example of criminals piecing together bits and pieces of

compromised PII for profit is the development of "Fullz" packages.[21] With "Fullz"

---

[21] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not
limited to, the name, address, credit card information, social security number, date of birth, and
more. As a rule of thumb, the more information you have on a victim, the more money that can be
made off of those credentials. Fullz are usually pricier than standard credit card credentials,
commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning
credentials into money) in various ways, including performing bank transactions over the phone
with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials
associated with credit cards that are no longer valid, can still be used for numerous purposes,
including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule
account" (an account that will accept a fraudulent money transfer from a compromised account)
without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground
Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014),

packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

55.    Since 2020, ShinyHunters has stolen over 900 million customer records in a series of high-profile data breaches (e.g., GitHub, AT&T, Pizza Hut). The development of "Fullz" packages is highly likely considering the volumes of data acquired by ShinyHunters.  In other words, even if certain information such as social security numbers were not included in the PII that was exfiltrated in the Data Breach, criminals can easily create a Fullz package and either sell the information to the highest bidder or use the complete profile to perpetuate fraud or theft.

56.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach and signing up for the credit monitoring and identity theft protection services.

57.    Plaintiffs' mitigation efforts are also consistent with the several steps that the FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit

_____

https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texaslife-insurance.

CLASS ACTION COMPLAINT        23

bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[22]

58.    PII is a valuable property right. For example, sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[23] In 2019, the data brokering industry was worth roughly $200 billion.[24]

59.    As a result of the Data Breach, Plaintiffs' and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

60.    Given the type of targeted attack in this case, sophisticated criminal activity, and the type of PII involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark

---

[22] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps
[23] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[24] *Column: Shadowy data brokers make the most of their invisibility cloak,* https://www.latimes.com/business/story/2019-11-05/column-data-brokers

web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

61.     Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

62.     The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from the Data Breach.

63.     Furthermore, Defendants' poor data security practices deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to pay Defendants for products or services, customers understood and expected that they were, in part, paying for the protection of their personal data, when in fact, Defendants did not provide adequate security.  Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

## **CLASS ALLEGATIONS**

64. Plaintiffs brings this nationwide class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

65. The Class that Plaintiffs seeks to represent is defined as follows:

**Nationwide Class**

All individuals residing in the United States whose PII was accessed and acquired by an unauthorized party as a result of a data breach that occurred on, or about, May 20, 2024, as reported by Defendant Live Nation (the "Class").

**South Carolina Subclass**

All individuals residing in South Carolina whose PII was accessed and acquired by an unauthorized party as a result of the Data Breach as reported by Defendant Live Nation (the "South Carolina Subclass").

66. Collectively, the Class and South Carolina Subclass are referred to as the "Classes" or "Class Members."

67. Excluded from the Classes are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

CLASS ACTION COMPLAINT          26

68.     Plaintiffs reserve the right to amend the definitions of the Classes or add a Class or Subclass if further information and discovery indicate that the definitions of the Classes should be narrowed, expanded, or otherwise modified.

69.     <u>Numerosity</u>: The members of the Classes are so numerous that joinder of all members is impracticable, if not completely impossible. The members of the Classes are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time and such number is exclusively in the possession of Defendants, upon information and belief, millions of individuals were impacted in Data Breach.

70.     Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes. Among the questions of law and fact common to the Classes that predominate over questions which may affect individual Class Members, including the following:

a.  Whether and to what extent Defendants had a duty to protect the PII of Plaintiffs and Class Members;

b.  Whether Defendants had respective duties not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

c.  Whether Defendants had respective duties not to use the PII of Plaintiffs and Class Members for non-business purposes;

d.  Whether Defendants failed to adequately safeguard the PII of Plaintiffs and Class Members;

e.  Whether and when Defendants actually learned of the Data Breach;

f.  Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g.  Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their PII had been compromised;

h.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.  Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.  Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendants' wrongful conduct;

k.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm faced as a result of the Data Breach.

71.    <u>Typicality</u>: Plaintiffs' claims are typical of those of the other members of the Classes because Plaintiffs, like every other Class Member, were exposed to virtually identical conduct and now suffer from the same violations of the law as each other member of the Classes.

72.    <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenges of these policies hinges on Defendants' conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs.

CLASS ACTION COMPLAINT            28

73.  <u>Adequacy</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

74.  <u>Superiority and Manageability</u>: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

75.  The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient

CLASS ACTION COMPLAINT          29

and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

76.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

77.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

78.    Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the PII of Classes, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

79.     Further, Defendants have acted on grounds that apply generally to the Classes as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

80.     Likewise, particular issues under Rule 42(d)(1) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants failed to timely notify the Plaintiffs and the Classes of the Data Breach;

b. Whether Defendants owed a legal duty to Plaintiffs and the Classes to exercise due care in collecting, sharing, storing, and safeguarding their PII;

c. Whether Defendants' (or their vendors') security measures to protect their network were reasonable in light of industry best practices;

d. Whether Defendants' (or their vendors') failure to institute adequate data protection measures amounted to negligence;

e. Whether Defendants failed to take commercially reasonable steps to safeguard consumer PII;

f. Whether Defendants made false representations about their data privacy practices and commitment to the security and confidentiality of customer information; and

g. Whether adherence to FTC recommendations for protecting personal information would have reasonably prevented the Data Breach.

## CAUSES OF ACTION
### COUNT 1: NEGLIGENCE
**(On Behalf of the Plaintiffs and the Classes)**

81.   Plaintiffs re-allege and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

82.   Defendants require their customers, including Plaintiffs and Class Members, to submit non-public PII in the ordinary course of providing ticketing services for live entertainment events.

83.   Defendants gathered and stored the PII of Plaintiffs and Class Members as part of their business of soliciting its services to their customers. Plaintiffs and Class Members entrusted Defendants with their PII with the understanding that Defendants would adequately safeguard their information.

84.   Defendants had full knowledge of the types of PII they collect and the types of harm that Plaintiffs and Class Members would suffer if that data was accessed and exfiltrated by an unauthorized third-party.

85.   By collecting, storing, sharing, and using the Plaintiffs' and Class Members' PII for commercial gain, Defendants assumed a duty to use reasonable means to safeguard the personal data they obtain.

86.   Defendants' duty included a responsibility to ensure its vendors: (i) implemented reasonable measures to detect and prevent unauthorized intrusions into their network; (ii) were contractually obligated to adhere to the requirements of Defendants' privacy policy; (iii) were required to comply with the same statutes and data protection obligations as the Defendants; (iv) were required to submit to regular

privacy assessments and security audits; (v) were regularly audited for compliance with contractual and other applicable data protection obligations; and, (vi) were obligated to provide timely notice to individuals impacted by a data breach event.

87.     Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair or deceptive practices that affect commerce. Deceptive practices, as interpreted and enforced by the FTC, include failing to adhere to a company's own stated privacy policies.

88.     Defendants also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII they were no longer required to retain. Defendants had a duty to promptly and adequately notify Plaintiffs and the Classes of the Data Breach.

89.     Defendants have a duty to adequately disclose that the PII of Plaintiffs and the Classes within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Classes to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

90.     Defendants breached their duties, pursuant to the FTC Act, and other applicable standards, and thus were negligent, by failing to use reasonable measures

to protect Class Members' PII. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

    a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b. Failing to adequately monitor the security of their networks and systems;

    c. Allowing unauthorized access to Class Members' PII;

    d. Failing to detect in a timely manner that Class Members' PII had been compromised;

    e. Failing to remove former customers' PII it was no longer required to retain;

    f. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and,

    g. Failing to ensure their vendors implemented data security practices consistent with Defendants' published privacy policies.

91. Plaintiffs and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statue was intended to guard against.

92. The injuries resulting to Plaintiffs and the Classes because of Defendants failure to use adequate security measures was reasonably foreseeable. Further, the Data Breach was reasonably foreseeable given the Defendants prior experience with cyberattacks and data breaches.

CLASS ACTION COMPLAINT    34

93.    Plaintiffs and the Class were the foreseeable victims of a data breach. Defendants knew or should have known of the inherent risks in collecting and storing PII, the critical importance of protecting that PII, and the necessity of protecting PII transmitted to and maintained on third party systems.

94.    Plaintiffs and the Classes had no ability to protect the PII in Defendants' possession. Defendants were in the best position to protect against the harms suffered by Plaintiffs and the Classes as a result of the Data Breach.

95.    But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and the Classes, their PII would not have been compromised. There is a close causal connection between Defendants' failure to implement security measures to protect the PII of Plaintiffs and the Classes and the harm, or risk of imminent harm, suffered by Plaintiffs and the Classes.

96.    As a result of the Data Breach, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and increased risk their PII will be misused, where: (a) their

data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendants' possession or control and is subject to further unauthorized disclosures so long as Defendants fail to implement appropriate and reasonable measures to protect the PII.

97.    Additionally, as a direct and proximate result of Defendants' negligence, Plaintiffs and the Classes have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in its continued possession.

98.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

99.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data protection procedures; (ii) require vendors to submit to annual audits of their systems and protection procedures; and (iii) to provide adequate credit monitoring to all Class Members.

## COUNT 2: NEGLIGENCE *PER SE*
### (On Behalf of the Plaintiffs and the Classes)

100.    Plaintiffs reallege and incorporates by reference all the allegations contained in the foregoing paragraphs, as if fully set forth herein.

101.   Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair or deceptive practices that affect commerce. Deceptive practices, as interpreted and enforced by the FTC, include failing to adhere to a company's own stated privacy policies.

102.   Defendants violated Section 5 of the FTC Act by failing to adhere to its own Privacy Policy regarding the confidentiality and security of Plaintiffs and Class Members information. Defendants further violated Section 5 of the FTC Act, and other state consumer protection statutes by failing to use reasonable measures to protect PII.

103.   Defendants' violations of Section 5 of the FTC Act, and other state consumer protection statutes, constitutes negligence *per se.*

104.   Plaintiffs and Class Members are within the class of persons Section 5 of the FTC Act, and other state consumer protection statutes, were intended to protect. Moreover, the harm that has occurred is the type of harm the FTC Act, and similar state statutes were intended to guard against.

105.   But for Defendants wrongful and negligent breach of duties owed to Plaintiffs and the Classes, the PII of Plaintiffs and the Class would not have been compromised.

CLASS ACTION COMPLAINT          37

106.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendants' possession or control and is subject to further unauthorized disclosures so long as Defendants fail to implement appropriate and reasonable measures to protect the PII.

107.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the Classes have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

108.    Additionally, as a direct and proximate result of Defendants' negligence, Plaintiffs and the Classes have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendants' possession and is subject

CLASS ACTION COMPLAINT          38

to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in its continued possession.

109. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

110. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data protection procedures; (ii) require vendors to submit to annual audits of their systems and protection procedures; and (iii) to provide adequate credit monitoring to all Class Members.

## COUNT 3: BREACH OF IMPLIED CONTRACT
### (On Behalf of the Plaintiffs and the Classes)

111. Plaintiffs reallege and incorporates by reference all the allegations contained in the foregoing paragraphs, as if fully set forth herein.

112. Defendants require their customers, including Plaintiffs and Class Members, to submit non-public PII in the ordinary course of providing ticketing services for live entertainment events.

113. Plaintiffs and the Classes entrusted their PII to Defendants. In so doing, Plaintiffs and the Classes entered implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information confidential, and to timely and accurately notify Plaintiffs and the Classes if their data had been compromised or stolen.

CLASS ACTION COMPLAINT           39

114.    Defendants promulgated, adopted, and implemented written privacy policies whereby they promised Plaintiffs and Class Members that they would (a) use PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiffs and Class Members with prompt notice of any unauthorized access and/or theft of their PII, (e) reasonably ensure their vendors safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses, and (f) retain the PII only under conditions that kept such information secure and confidential.

115.    Plaintiffs and Class Members would not have entrusted their PII to Defendants in the absence of their implied promise to implement reasonable data protection measures.

116.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendants.

117.    Defendants breached the implied contracts it made with Plaintiffs and the Classes by failing to protect their personal information, by failing to delete the information once the relationship ended, and by failing to provide adequate notice of the Data Breach.

118.    As a direct and proximate result of Defendants breach of the implied contracts, Plaintiffs and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

CLASS ACTION COMPLAINT          40

119.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

120.   Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data protection procedures; (ii) require vendors to submit to annual audits of their systems and protection procedures; and (iii) to provide adequate credit monitoring to all Class Members.

**COUNT 4: UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Classes)**

121.   Plaintiffs reallege and incorporates by reference all the allegations contained in the foregoing paragraphs, as if fully set forth herein.

122.   Plaintiffs bring this Count in the alternative to the breach of implied contract count above.

123.   By providing their PII, Plaintiffs and Class Members conferred a monetary benefit on Defendants. Defendants knew that Plaintiffs and Class Members conferred a benefit upon them and have accepted and retained that benefit. Defendants sold their PII and used the data to market and sell additional services to Plaintiffs and Class Members.

124.   Defendants failed to secure Plaintiffs' and Class Members' PII and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their PII provided.

125.    If Plaintiffs and Class Members had known that Defendants would not use adequate data security practices, they would not have entrusted their PII to Defendants.

126.    Plaintiffs and Class Members have no adequate remedy at law.

127.    Under the circumstances, it would be unjust for Defendants to retain any of the benefits that Plaintiffs and Class Members conferred upon them.

128.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendants' possession or control and is subject to further unauthorized disclosures so long as Defendants fail to implement appropriate and reasonable measures to protect the PII.

129.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all

profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

### COUNT 5: VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL") - Unlawful Business Practice
### (Cal. Bus. & Prof. Code § 17200, *et seq*.)
### (On Behalf of Plaintiffs and the Classes)

130.    Plaintiffs reallege and incorporate by reference the paragraphs above as if fully set forth herein.

131.    As discussed above, Defendants' acts, practices, and omissions at issue in this matter, particularly those related to data privacy and protection emanated from its headquarters in Beverly Hills, California.

132.    As customers, Plaintiffs and the Classes entrusted Defendants with their PII.

133.    By reason of the conduct alleged herein, Defendants engaged in unlawful practices within the meaning of the UCL. The conduct alleged herein is a "business practice" within the meaning of the UCL.

134.    Defendants stored the PII of Plaintiffs and members of the respective Class in Defendants' electronic databases. Defendants knew or should have known they did not employ reasonable and appropriate security measures that complied "with federal regulations" and that would have kept Plaintiffs' and the other Class Members' PII secure and prevented the loss or misuse of Plaintiffs' and the other Class Members' PII. Defendants did not disclose to Plaintiffs and Class Members that their data systems were not secure.

135.    Plaintiffs and Class members were entitled to assume, and did assume, Defendants would take appropriate measures to keep their PII safe as represented by Defendants in their privacy policy. Defendants did not disclose at any time that

CLASS ACTION COMPLAINT          43

Plaintiffs' PII was vulnerable to hackers because Defendants' administrative and/or technical security measures were inadequate, and Defendants were the only ones in possession of that material information, which they had a duty to disclose.

136.   Defendants violated the UCL by misrepresenting, both by affirmative conduct and by omission, their ability to safely store Plaintiffs' and Class Members' PII as provided in their privacy policy.

137.   Defendants also violated the UCL by failing to implement reasonable and appropriate security measures or follow industry standards for data security, and by failing to immediately notify Plaintiffs and the other Class members of the Data Breach. If Defendants had complied with these legal requirements, Plaintiffs and the other Class members would not have suffered the damages related to the Data Breach.

138.   Further, as alleged here in this Complaint, Defendants engaged in unlawful business practices in the conduct of business transactions, in violation of the UCL, by and including the:

  a.  failure to maintain (or ensure their vendors maintain) adequate computer systems and data security practices to safeguard PII;

  b.  failure to disclose that their (or their vendors') computer systems and data security practices were inadequate to safeguard PII from theft;

  c.  failure to timely and accurately disclose the Data Breach to Plaintiffs and Class members;

139.   Defendants knew or should have known that their data security practices were inadequate to safeguard the PII of Plaintiffs and Class members, deter hackers, and detect a breach within a reasonable time, and that the risk of a data breach was highly likely.

140.   As a direct and proximate result of Defendants' violation of the UCL, Plaintiffs and Class members are susceptible to damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

141.   As a result of Defendants' unlawful business practices and violations of the UCL, Plaintiffs and the members of the Classes are entitled to restitution, disgorgement of wrongfully obtained profits, and injunctive relief.

## COUNT 6: INVASION OF PRIVACY
### (On Behalf of Plaintiffs and the Classes)

142.   Plaintiffs re-allege and incorporate by reference the above paragraphs as if fully set forth herein.

143.   Plaintiffs and Class Members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

144.   Defendants owed a duty to their current, former, and prospective customers, including Plaintiffs and Class Members, to keep their PII confidential.

145.   Defendants failed to protect and released to unknown and unauthorized third parties the PII of Plaintiffs and Class Members.

146.   The PII that was publicized during the Data Breach was highly sensitive, private, and confidential.

147.   Defendants acted with reckless disregard for the privacy of Plaintiffs and Class Members rising to the level of (1) an intentional intrusion by Defendants, (2) into a matter that Plaintiff and Class Members have a right to keep private (i.e., their PII), and (3) which is highly offensive to a reasonable person.

148.   Defendants (or their vendors) acted knowingly when they permitted the Data Breach to occur; they had actual knowledge that their information security practices were inadequate and insufficient. Defendants knew that PII was stored for years after Defendants no longer had a legitimate use for such data. Defendants also knew that the PII they stored was not securely encrypted, and that its systems or that their third-party venders were vulnerable to foreseeable threats as a result of inadequate security measures and training.

149.   Defendants were aware of the potential of a data breach and failed to adequately safeguard its systems and/or implement appropriate policies and procedures to prevent the unauthorized release of Plaintiffs' and Class Members' data.

150.   Defendants acted with such reckless disregard as to the safety of Plaintiffs' and Class Members' PII to rise to the level of intentionally allowing the intrusion upon Plaintiffs' and Class Members' seclusion.

151.   The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiffs and Class Members is highly offensive to a reasonable person.

152.   Plaintiffs and Class Members have been damaged by the invasion of their privacy in an amount to be determined at trial.

## COUNT 7: DECLARATORY JUDGMENT
### (On Behalf of Plaintiffs and the Classes)

153.   Plaintiffs re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

154.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad

1    authority to restrain acts, such as here, that are tortious and violate the terms of the
2    federal and state statutes described in this Complaint.

3        155.    An actual controversy has arisen in the wake of Defendants' data
4    breach regarding its present and prospective common law and other duties to
5    reasonably safeguard its customers' PII and whether Defendants are currently
6    maintaining data security measures adequate to protect Plaintiffs from further data
7    breaches that compromise their PII.

8        156.    Plaintiffs allege that Defendants' data security measures remain
9    inadequate. Plaintiffs will continue to suffer injury as a result of the compromise
10   of their PII and remain at imminent risk that further compromises of their PII will
11   occur in the future.

12       157.    Pursuant to its authority under the Declaratory Judgment Act, this
13   Court should enter a judgment declaring, among other things, the following:

14           a. Defendants continue to owe a legal duty to secure current and former
15              customers' PII and to timely notify them of a data breach under the
16              common law, Section 5 of the FTC Act, and various state statutes;
17           b. Defendants continue to breach this legal duty by failing to employ
18              reasonable measures to secure Plaintiffs' and Class Members' PII.

19       158.    The Court also should issue corresponding prospective injunctive
20   relief requiring that Defendants employ adequate security protocols consistent with
21   law and industry standards to protect consumers' PII.

22       159.    If an injunction is not issued, Plaintiffs will suffer irreparable injury,
23   and lack an adequate legal remedy, in the event of another data breach. The risk of
24   another such breach is real, immediate, and substantial. If another breach occurs,
25   Plaintiffs will not have an adequate remedy at law because many of the resulting
26   injuries are not readily quantified and they will be forced to bring multiple lawsuits
27   to rectify the same conduct.

28

160. The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another massive data breach occurs, Plaintiff will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

161. Issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by encouraging Defendants to take necessary action to prevent another data breach, thus eliminating the additional injuries that would result to Plaintiffs and the millions of individuals whose PII would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Classes alleged herein, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as the representatives for the Classes and Plaintiffs' attorneys as Class Counsel;

B. For an order declaring the Defendants' conduct violates the causes of action referenced herein;

C. For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

D. Ordering Defendants to pay for lifetime credit monitoring services for Plaintiffs and the Classes;

CLASS ACTION COMPLAINT        48

E.    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

F.    For prejudgment interest on all amounts awarded;

G.    For an order of restitution and all other forms of equitable monetary relief;

H.    For injunctive relief as pleaded or as the Court may deem proper; and

I.    For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit, and any other expense, including expert witness fees;

J.    Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all claims in this Complaint and of any and all issues in this action so triable as of right.

Dated: June 13, 2024          By: */s/ Eric M. Poulin*

**POULIN | WILLEY ANASTOPOULO, LLC**
Eric M. Poulin (California State Bar No. 298476)
*eric.poulin@poulinwilley.com*
Paul J. Doolittle (*Pro Hac Vice* Forthcoming)
*paul.doolittle@poulinwilley.com*
Seth Little (*Pro Hac Vice* Forthcoming*)
*seth.little@poulinwilley.com*
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536

CLASS ACTION COMPLAINT    49

1     AND

2     **BOHREN LAW**

3     John C. Bohren (California State Bar
      No. 298476)

4     8560 West Sunset Boulevard, 4th
      Floor

5     West Hollywood, CA 90069

6     Telephone: (619) 433-2803

7     Fax: (800) 867-6779

8     *Attorneys for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT          50